

THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   16-18048-TJC |
| Kent Manor Inn, LLC | * | Chapter   11 |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OF DECISION

Before the court is a motion filed by the Debtor Kent Manor Inn, LLC seeking to surcharge the sale proceeds of the collateral of The Columbia Bank (the "Bank") pursuant to 11 U.S.C. §506(c). ECF 222. The Debtor seeks to surcharge various legal fees and certain payroll expenses it incurred in preserving and selling the Bank's collateral. The Bank opposes the motion. ECF 225. For the reasons in this memorandum, the court will allow the debtor to surcharge the sale proceeds the amount of $114,959.64.

The court has jurisdiction over this matter under 28 U.S.C. §§157(a) and 1334 and Local Rule 402 of the United States District Court for the District of Maryland. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

### Findings of Fact

On June 14, 2016, certain creditors of the Debtor filed an involuntary bankruptcy petition commencing this proceeding. An Order for Relief under Chapter 11 was entered on August 15, 2016.

1

At the time of the filing, the Debtor owned and operated the property known as the Kent Manor Inn, located at 500 Kent Manor Drive, Stevensville, Maryland (the "Inn"). The Inn consists of a historic inn and other buildings located on roughly 220 acres of woods and farmland. The Inn was operated both as a hotel and as a venue for weddings, meetings, retreats and other events. The Debtor also had 35 full and part-time employees and also owned personal property used in its operations. The Debtor reported that there were more than 30 weddings booked for the remainder of 2016 and over 5,000 guests were expected to visit throughout 2016. ECF 11 at p. 2.

The Bank held two obligations of the Debtor with a total outstanding balance of approximately $3.1 million, plus legal fees and expenses. *See* Claim No. 5-1. The loans were secured by deeds of trust against the real property, and also by security interests in virtually all of the assets of the Debtor, including receivables, contract rights, equipment, and personal property used in the operation of the Debtor's business.

The filing of the involuntary petition on June 14, 2016, stayed a foreclosure sale of the Debtor's real property and improvements that the Bank had scheduled for the next day. On June 28, 2016, the Bank filed a motion to dismiss the case or, alternatively, to appoint a Chapter 11 trustee. ECF 7. The Bank and the Debtor resolved the motion by a consent order entered on August 17, 2016. ECF 37. Under the agreement embodied in the consent order, the automatic stay was lifted, but the Bank agreed to forebear from exercising its rights provided the Debtor met certain conditions. The primary conditions were that the Debtor would retain a broker and sell the Debtor's real and personal property by January 31, 2017, and meet certain deadlines for proceeding with the sale. The agreement gave the Debtor a list of brokers it could retain, and provided that the Bank had the right to approve the broker. *Id.* at 4. The Debtor retained

Stephen Karbelk and Century 21 New Millenium as the real estate broker. ECF 107. Mr. Karbelk had been the broker retained by the Bank in connection with the foreclosure sale.

The Debtor, the Bank and the petitioning creditors filed a joint motion to approve the agreement embodied in the consent order. ECF 45. The joint motion stated that "[a]ccording to the Bank's appraisal, the Real Property has a fair market value of $6,100,000." ECF 45 at 5. The court approved the motion by order entered on September 19, 2016. ECF 105.

The Debtor's real and personal property were actively marketed. Bid procedures were approved and several prospective buyers submitted contracts. In accordance with the approved sales procedures, an auction was held on December 1, 2016, and the court approved the sale of substantially all of the Debtor's assets at a hearing held on December 5, 2016. *See* ECF 154. The sale included the real property and improvements on which the Inn was operated, as well as all personalty and equipment used in the operations of both the hotel and event business, including event contracts. *Id*. at Schedules 2, 3, and 5. Notwithstanding the expectation of the parties that the real property alone would sell for $6 million consistent with the Bank's appraisal, the final sales price of the real and personal property was $4,110,000. ECF 172.

Closing was required to occur on or before January 31, 2017. The Debtor understood that it was obligated under the asset purchase agreement to maintain its business operations through closing. ECF 162. December and January are traditionally slow months and the Debtor did not generate sufficient cash flow from operations to maintain its business as a going concern, including paying its employees. On December 27, 2016, the Debtor filed an emergency motion for authority to obtain debtor-in-possession financing of up to $100,000 "to fund operations and to pay such other business expenses necessary to preserve the Debtor's business." *Id.* at 5. The DIP loan was to be provided by Harford Hotels, LLC, an entity that was owned in part by an insider of the Debtor. The Bank opposed the DIP loan to the extent the Debtor sought to prime

its liens. ECF 174. After a hearing, the court authorized the DIP loan, allowing the Debtor to borrow the funds and granting Harford Hotels a super-priority claim, but not a priming lien over the Bank's deeds of trust liens or security interests. The court found that the DIP loan was essential for the Debtor to comply with its obligations under the purchase agreement, and that the both the estate and the Bank would be substantially harmed if the sale did not close.

The Debtor borrowed $58,099.45 under the DIP loan. The funds were used to pay payroll of $27,831.45 for the period ending December 17, 2016, and $30,268 for the period ending December 31, 2016. ECF 193 at p. 5.

On December 28, 2016, Judy A. Robbins, the United States Trustee for Region Four, filed a motion to convert the case to Chapter 7 or dismiss the case. ECF 167. She pointed out that the Debtor reported a net loss from operations of $58,647.64, for November and had post-petition accounts payable of $68,137, with insufficient resources to pay them. She argued that the net sale proceeds would be insufficient to pay all administrative claims and expenses and therefore the case should be converted to Chapter 7 or dismissed.

The Bank opposed the motion to dismiss or convert. ECF 190. The Bank recognized that "the sale proceeds are insufficient to fully pay all secured claims, costs of sale and administrative expenses." *Id.* at 2. Nevertheless, the Bank requested that the court allow the case to remain in Chapter 11 to allow the estate to complete the sale transaction. *Id.*[1]

The sale closed on January 31, 2017. At closing, the Debtor paid the principal and accrued interest on the Bank's loans as well as certain other expenses and escrowed the balance of the sale proceeds.

At the time that the order of relief was entered, the Debtor was represented by the law firm of Yumkas, Vidmar, Sweeney & Mulrenin, LLC ("YVSM"). ECF 27. YVSM withdrew as

---

[1] The hearing on the motion to convert or dismiss has been continued by agreement of the parties pending resolution of the motion to surcharge collateral.

counsel for the Debtor in November 2016, because it represented the stalking horse purchaser in unrelated matters. *See* ECF 128 and 137. On December 22, 2016, YVSM filed its first and final application for compensation for services rendered, seeking total fees and expenses of $100,820.58, net of a reduction for billing discretion. ECF 161. In the application, YVSM divided its services into eight categories listed below:

| Category | Hours | Fees |
|---|---|---|
| 1.  Petition and Schedules | 57.8 | $12,207.50 |
| 2.  Drafting and Filing Various Motions | 41.1 | $11,342.50 |
| 3.  Debtor-in-Possession Administration Issues | 29.6 | $7,384.50 |
| 4.  Executory Contracts | 14.8 | $4,040.00 |
| 5.  Applications to Employ/Applications for Fees | 50.8 | $10,448.50 |
| 6.  Withdrawal and Transition to Substitute Counsel | 22.0 | $6,361.50 |
| 7.  Contested Matters | 31.5 | $8,543.50 |
| 8.  Sale of Assets | 151.3 | $44,365.00 |
| **Total:** | **398.9** | **$104,693.00** |

The YVSM application was approved by order entered on February 10, 2017. ECF 214. The firm was awarded fees in the amount of $96,381 and expenses of $1,427.58, for a total of $97,808.58.[2] YVSM has been paid $58,279. ECF 233.

McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A. ("MHJKGL"), entered its appearance as replacement counsel for the Debtor, and the court approved the employment on November 21, 2016. ECF 136. The firm's fees exceed $43,000 as of March 2017, but the Debtor seeks only to surcharge the amount of $39,000 attributable to the sale.[3] The Bank does not dispute that, given the timing of the firm's entry into the case, $39,000 of fees were properly incurred in concluding the sale.

The Debtor filed the motion to surcharge collateral on March 6, 2017. ECF 222. The court held a hearing on the motion and the Bank's opposition on April 27, 2017. The hearing

---

[2] Adjustments were made to YVSM's fees to take into account its withdrawal from the case and the substitution of new counsel as well as for general billing discretion.
[3] The Debtor holds sufficient funds to pay the $39,000 subject to fee application.

was combined with the hearing on the Debtor's objection to the Bank's claim for legal fees and other expenses. The court resolved the objection to the Bank's legal fees and other expenses by bench ruling on April 28, 2017, ECF 241 and 242, leaving only the surcharge motion for resolution.

## Conclusions of Law

The Debtor seeks to surcharge the following expenses: (1) YVSM fees in the amount of $67,029.24; (2) MHJKGL fees of $39,000; (3) the DIP loan of $58,099.45; and (4) a reserve to cover $5,000 for other administrative expenses necessary to preserve and dispose of the Bank's collateral. Although the Bank does not dispute that the sale proceeds may be surcharged for a portion of the legal fees, it objects to the Debtor's effort to surcharge the remainder of the legal fees, the DIP loan and the reserve.

Generally, administrative expenses are paid from unencumbered assets of the bankruptcy estate. *See K & L Lakeland, Inc.*, 128 F.3d 203, 207 (4th Cir. 1997); *Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet, Inc.)*, 26 F.3d 481, 483 (4th Cir. 1994). Administrative expenses include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. §503(b)(1). Under §506(c), the exception to this general rule, states that

> (c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

§506(c). This section protects the estate from expenditures to preserve collateral that only benefited a secured creditor. It also protects a secured creditor by permitting surcharge of costs of the estate only when those costs directly protected and preserved collateral for the benefit of a secured creditor. *See K & L Lakeland, Inc.*, 128 F.3d at 207; *In re Bob Grisset Golf Shoppes, Inc.*, 50 B.R. 598 (Bankr. E.D. Va. 1985). The legislative history of §506(c) reveals that the

purpose of the statute was to allow recovery from a secured party "[a]ny time the . . . debtor-in-possession expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral . . . ."  124 Cong. Rec. H. 11095 (daily ed. Sept. 28, 1978).  The provision prevents "a windfall to a secured creditor at the expense of the estate." *In re JKJ Chevrolet, Inc.*, 26 F.3d at 483.

A debtor-in-possession must satisfy three conditions to surcharge a secured creditor for an administrative expense:  The expense "(1) was incurred primarily to protect or preserve [secured creditor's] collateral, (2) provided a direct and quantifiable benefit to [the secured creditor], and (3) was reasonable and necessary." *In re K & L Lakeland, Inc.*, 128 F.3d at 207-208; *see also In re Visual Industries, Inc.,* 57 F.3d 321, 325 (3d Cir. 1995) ("a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a *direct* benefit to the secured creditors.") (emphasis in original); *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) ("[T]o warrant [§]506(c) recovery . . . [the claimant] must show that . . . funds were expended primarily for the benefit of the creditor and that the creditor directly benefited from the expenditure."); *see In re Ware,* 2014 WL 2508731, *5 (Bankr. E.D. Va. June 3, 2014); *In re Bob Grisset Golf Shoppes, Inc.*, 50 B.R. at 602.

The debtor-in-possession bears the burden of establishing these elements. *In re D&M Land Co.,* 431 B.R. 133, 137 (Bankr. E.D.N.C. 2010) (citing *In re Ferncrest Court Partners, Ltd,* 66 F.3d 778, 782 (6th Cir. 1995)).  The court must make affirmative findings that the requirements of §506(c) have been met before authorizing a surcharge. *In re K & L Lakeland, Inc.*, 128 F.3d at 210.

The parties disagree that all the elements for surcharge have been met here.

*Direct and Quantifiable Benefit*

7

The court begins with a discussion of the second element necessary to establish surcharge under the *K & L Lakeland* test: Whether the expenses provided a direct and quantifiable benefit to the Bank.

The evidence established that there was a quantifiable benefit from the bankruptcy sale compared to a foreclosure sale. Mr. Karbelk was qualified as an expert witness and testified that the bankruptcy sale generated $500,000 more than the foreclosure sale would have generated. His testimony was credible. He acted as the broker for the Bank pre-petition, and for the Debtor post-petition, and presented an objective view of the sale process.

The facts support his opinion. The foreclosure sale would have been of the Debtor's real property only. The bankruptcy sale was of the Debtor's business as a going concern and included all personal property necessary to conduct the wedding and events business, including contracts for future events. A number of prospective bidders considered participating in the bankruptcy sale who were interested in the real estate only and had no interest in operating the Debtor's business. None submitted a bid. The only two parties to submit bids both intended to operate the Debtor's business. Thus, the clear implication is that the marketplace valued the Debtor's business as a going concern greater than the value of the real estate alone.

Further, the purchaser in the bankruptcy sale received, in addition to the real property, all of the Debtor's assets pursuant to a §363(f) order selling them free and clear of liens and claims.

> The purpose of allowing the sale of an asset "free and clear" of third-party interests is to "maximize the value of the asset, and thus enhance the payout made to creditors." *In re Mundy Ranch, Inc*., 484 B.R. 416, 422 (Bankr. D.N.M. 2012) (citation omitted). Without this protection, it would be difficult to sell estate assets promptly, and "prospective buyers would be unwilling to pay a fair price for the property subject to sale; instead, the price would have to be discounted, perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset." *Id*. at 422 (citation omitted). In short, Section 363(f) is a powerful and necessary tool for achieving one of the primary purposes of the Bankruptcy Code. *See also Toibb v. Radloff*, 501 U.S. 157, 163, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991)

> (recognizing the Bankruptcy Code's general policy of "maximizing the value of the bankruptcy estate").

*In re USA United Fleet Inc.*, 496 B.R. 79, 83 (Bankr. E.D.N.Y. 2013); *see also In re WBQ Partnership*, 189 B.R. 97, 108 (Bankr. E.D. Va. 1995); *In re Medical Software Solution*s, 286 B.R. 431, 446-447 (Bankr. D. Utah 2002). This is especially true where a debtor sells substantially all of its assets as a going concern.

In addition, the Debtor was able to assume and assign the wedding and other contracts to the buyer. It is widely known that the ability to assume and assign executory contracts in a sale add value to a bankruptcy sale transaction.

> Section 365(f) performs an important function for maximizing the value in an estate for creditors. It protects the body of creditors as a whole from provisions . . . that frustrate the estate's ability to convert the economic value in [executory contracts] into cash that can increase creditor recoveries.

*In re Ames Dept. Stores, Inc.,* 316 B.R. 772, 794 (Bankr. S.D.N.Y. 2014); *see In re Rickel Home Centers, Inc.*, 209 F.3d 291, 298 (3d Cir. 2000).

Finally, in the bankruptcy sale, Mr. Karbelk stated he was able to provide complete information to prospective purchasers, including access to the Debtor's business and financial records and to management. That was not the case in connection with the anticipated foreclosure. Mr. Karbelk explained that the availability of such information enhances the value of the assets being sold.

The court concludes that the bankruptcy sale of the Debtor's assets as a going concern generated $500,000 more than the foreclosure sale of the Debtor's real property would have generated. This does not end the inquiry, however. The benefit resulting from the bankruptcy sale must be direct and quantifiable *to the Bank*. *K & L Lakeland*, 128 F.3d at 207 (the trustee may surcharge collateral for administrative expenses "*to the extent the expenditures benefit the secured creditor*." (emphasis in original)). In this case, the court will resolve this question by

comparing what the Bank received through the bankruptcy sale with the amount the Bank would have been paid in a foreclosure sale.

The Bank has been paid in full through the bankruptcy sale. The sale price was $4,110,000. At closing, the Bank's principal and interest claims were paid in full. The Debtor objected to various late fees and other expenses charged by the Bank and also to the Bank's legal fees. The objection was resolved by order entered on May 1, 2017. The Debtor holds sufficient funds to pay the previously disputed fees and expenses. Accordingly, the Bank either has been or will soon be paid in full for all amounts due and allowed.

The same would not have been true of a foreclosure sale. The following chart shows that the Bank would not have been paid in full in a foreclosure sale:

| | |
|---|---:|
| Foreclosure Sales Price | $3,610,000.00 |
| Less : | |
|    Brokerage Fee to Mr. Karbelk (3%) | $108,300.00 |
|    Property Taxes, Hotel Taxes | $188,590.71 |
|    Bank Note 1 | $1,124,734.15 |
|    Bank Note 2 | $2,164,447.45 |
|    Late charges | $2,530.63 |
|    Auction expenses | $4,633.00 |
|    Appraisal fee | $9,500.00 |
|    Attorney fees and expenses | $122,223.70 |
| Total Expenses | $3,724,959.64 |
| | |
| Shortfall | ($114,959.64) |

Some of the expenses require an explanation. Mr. Karbelk testified that the Bank agreed to pay him a 3% brokerage fee upon a foreclosure sale. The Bank does not dispute that the taxes and other charges of $188,590.71 had to be paid. The amounts paid on the Bank's notes are taken from the settlement statement that was admitted into evidence. Debtor's Hr'g Ex. 7. The late charges, auction and appraisal fees, and attorney fees are the amounts that have been allowed by the court. ECF 241.

In making the comparison between the foreclosure sale and the bankruptcy sale, the court uses the January 31, 2017 sale closing date as the appropriate date for Bank's payoff under a foreclosure sale. While the foreclosure sale may have occurred sooner, it also may have been delayed well past the bankruptcy sale closing date, considering the extensive prepetition litigation between the parties. The Bank and the Debtor agreed to a definitive sale date in the sale process. Their agreed upon date is an appropriate date to use for the foreclosure sale date.

Accordingly, the court concludes that the direct and quantifiable benefit to the Bank from the Debtor's selling its business as a going concern in the bankruptcy sale, rather than allowing the real estate and improvements to be sold at a foreclosure sale, is $114,959.64.

*Reasonable and Necessary to Protect and Preserve the Collateral*

"'Necessary' costs are those that are unavoidably incurred by a trustee in the preservation or disposal of the secured property." *In re Ware,* 2014 WL 2508731, *6 (Bankr. E.D. Va. June 3, 2014) (quoting *In re Combined Crofts Corp.*, 54 B.R. 294, 297 (Bankr. W.D. Wis. 1985)). Courts have measured "the necessity and reasonableness of the Debtor's incurred expenses against the benefits obtained for the secured creditor and the amount that the secured creditor would have necessarily incurred through foreclosure and disposal of the property." *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260 (9th Cir. 2000) (citing *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 727 (Bankr. N.D. Ill.1988)). "An expense is not 'necessary' if it bears no relation to the collateral or was not essential to preserve or increase the value of the collateral." 4 Collier on Bankruptcy ¶506.05[4] (16th ed. 2015). Further,

> if a secured creditor has a lien on all, or virtually all, of a debtor's assets, the debtor is engaged in ongoing business operations, and the debtor's continued operations preserve or enhance the value of the secured creditor's collateral, items that may qualify as "necessary" expenses chargeable against the collateral include the debtor's payroll costs, insurance costs, workers' compensation expenses, and postpetition administrative taxes.

11

Collier on Bankruptcy ¶506.05[4]; *see In re Visual Industries, Inc.*, 57 F.3d 321, 327 (3d. Cir. 1995) ("In a reorganization, it is essential that the debtor keep his post-bankruptcy accounts paid, so that tradesman will have an incentive to deal with the company in Chapter 11. If this goal is not reached, in many cases Chapter 11 debtors will find it increasingly difficult to maintain operations and to reorganize as going concerns, and the purpose of Chapter 11 would be seriously undermined.") (quoting *Matter of P.C., Ltd.*, 929 F.2d 203, 206 (5th Cir. 1991)); *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94-95 (3d Cir. 1986) (court found that post-petition gas service was a necessary administrative expense to preserve the going concern value of the estate).

Here, the Bank does not dispute that the MHJKGL fees of $39,000 were incurred primarily to protect and preserve the collateral and were necessary and reasonable. It also does not dispute that the portion of the YVSM fees incurred for the sale meet the test as well. The YVSM fees generated directly for the sale, identified as category 8 above, were $44,365. Applying the billing adjustment of approximately 8% made to the YVSM fees, the amount of the firm's fees attributable to the sale is $40,842.68. The court agrees with the Bank that YVSM's fees incurred for general case administration and the remaining categories of services, while reasonable compensation under §330, were not shown to be necessary to preserve and protect the Bank's collateral. Thus, the court concludes that the MHJKGL fees of $39,000 and YVSM fees of $40,842.68, or a total of $79,842.68, were reasonable and necessary to protect, preserve and dispose of the Bank's collateral. The court will allow $79,842.68 of the requested legal fees as a surcharge against the sale proceeds.

The court turns to the Debtor's request to surcharge the amount of $58,099.45 borrowed against the DIP loan for the December 16 and December 31 payrolls. The Debtor understood that, as a condition of closing, it was obligated under the asset purchase agreement to maintain its

12

business as a going concern and comply with its event contracts. It said so both in its motion to approve the DIP loan, filed on an emergency basis one month prior to the sale closing date, and at the hearing held on the motion. In what is traditionally a slow period in the Debtor's business cycle, the Debtor's revenues during that time frame were insufficient to pay the payroll, and therefore the DIP loan was necessary to cover the shortfall. The court accepted the Debtor's position that the asset purchase agreement obligated it to continue to operate as a going concern as a condition to closing, and that the Debtor was required to pay its employees to fulfill that obligation. Thus, the payroll was necessary for the Debtor to comply with its obligations under the asset purchase agreement. The court authorized the DIP loan, finding that both the Bank and the Debtor would be substantially harmed if the Debtor could not complete the sale. Accordingly, the payroll of $58,099.45 meets the requirements of the *K & L Lakeland* test that the expenses must be necessary and reasonable to protect and preserve the secured creditor's collateral.

As stated above, however, the benefit to the Bank from the bankruptcy sale was $114,959.64. The court allowed $79,842.68 of legal fees as a surcharge. Therefore, the surcharge of the payroll expenses will be limited to $35,116.96.[4] For similar and other reasons, the court need not consider the Debtor's request to surcharge an additional $5,000.

---

[4] It is not clear whether the Fourth Circuit adheres to the minority view that an expense must be actually paid before the trustee or debtor in possession can seek to surcharge it. In *K & L Lakeland*, Judge Ervin wrote the panel opinion denying surcharge. In Section IV.A of the opinion, he held that, as a matter of law, §506(c) requires "an actual expenditure in order for the estate to be reimbursed." *K & L Lakeland*, 128 F.3d at 210. Neither of the other two members of the panel joined in this ruling of Part IV.A of the opinion. Chief Judge Hamilton expressly dissented from Part IV.A, and Judge Phillips did not join Part IV.A. Thus, of the three members, one member held that an actual expenditure is required for surcharge, one member expressly rejected that view, and one member did not decide the issue. As a result the precedential effect of Part IV.A of the opinion is unclear. Moreover, the holding of Part IV.A would seem to be inconsistent with the Fourth Circuit's stated policy that Bankruptcy Court's are given wide latitude in determining the timing of payment of administrative expenses. *CIT Commun. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 242 (4th Cir. 2005). In any event, here YVSM has been paid in excess of the amount that the court has allowed for surcharge and the December payroll has been paid. While the MHJKGL fees of $39,000 have not been paid, the Debtor holds sufficient funds to pay the fees subject to final fee application. The amount of the surcharge of the MHJKGL fees can be modified if the court does not allow the full $39,000.

**Conclusion**

For the foregoing reasons, the court will grant the Debtor's motion in part and will surcharge the sale proceeds in the amount of $79,842.68 for legal fees and $35,116.96 for payroll expenses, for a total of $114,959.64. A separate order will follow.

cc:    Debtor
       Counsel for the Debtor
       The Columbia Bank
       Counsel for The Columbia Bank
       Delmarva Power and Light Company
       Counsel for Delmarva Power and Light Company
       United States Trustee

**End of Memorandum of Decision**